## THOMAS *v.* ARKANSAS LIME COMPANY.

### Opinion delivered June 26, 1922.

1. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—On appeal from a judgment founded on a verdict directed in defendants' favor, in determining whether the evidence made a case for the jury, the testimony will be viewed in the light most favorable to plaintiff.

2. FERRIES—NEGLIGENCE IN OPERATION—EVIDENCE.—In an action by a father against a ferryman for the death of his child, drowned by falling off a ferry, evidence of negligence on the ferryman's part *held* insufficient to go to the jury.

Appeal from Stone Circuit Court, *Dene H. Coleman,* Judge; affirmed.

*Williamson & Williamson, Vaughan & Rector* and *Taylor Roberts,* for appellant.

It was error to direct a verdict, as there was evidence from which a jury might reasonably find that the child lost its life through the negligence of appellee. 148 Ark. 66; 120 Ark. 208; 98 Ark. 344; 105 Ark. 526. Where a verdict is directed the court will take that view of the evidence most favorable to appellant. 115 Ark. 166.

It was the duty of the ferryman to keep the approach to the ferry in proper condition. Case note 68 L. R. A. p. 159. As a carrier of passengers he is held to the highest degree of care. 82 Ark. 507; 102 S. E. 300; 88 S. W. 935. The ferryman was negligent in not supplying the lifeboat with paddles. 2 Hutchinson, Carriers, par. 911.

The inference of care on the part of plaintiff may be drawn from the absence of appearance of fault. 5 Cal. 360; 136 Mass. 366. The question of negligence of a child of tender years is a question of fact for the jury and not a matter of law. 100 Ark. 76, as is the question of whether proper appliances were used and properly managed. R. C. L. Vol. 2, p. 933; 85 Ark. 474; 55 N. Y. S. 266. It was not necessarily negligence for the child to be near the apron pole. 2 R. C. L. p. 935.

The mother was a competent witness in behalf of the father, who sued in a representative capacity. 90 Ark. 486.

*Samuel M. Casey,* for appellee.

Two causes of action were improperly joined in the one and only paragraph of the complaint. It would have been improper to allow Mrs. Thomas to testify for plaintiff where he was suing in his individual right. 90 Ark. 485; 59 Ark. 180. She refused the offer of the court to permit her to testify on the claim where plaintiff was suing as administrator.

Appellee was only bound to provide suitable and safe accommodations. 38 Am. Rep. 533. The death of appellant's intestate was due to pure misadventure ,for which no one was responsible. 18 A. R. p. 327-328. Plaintiff himself was guilty of contributory negligence which would bar a recovery. 72 Ark. 1; 59 Ark. 180; 77 Ark. 398; 143 Ark. 357.

McCULLOCH, C. J. Appellant, the plaintiff, in his own right and as administrator of the estate of his daughter, Rovelda Thomas, brought this suit against appellee, a corporation engaged in operating a ferry across White River, between Ruddells, in Izard County, and Mountain View, in Stone County, for damages to compensate for the death of his intestate daughter. The complaint was not divided into counts, and the prayer for judgment was in a single paragraph, damages being asked by the administrator for the pain and suffering of his intestate, and by the plaintiff, as the father of the child, for loss of services.

At the conclusion of the plaintiff's testimony, a verdict was directed in favor of the defendant, and this appeal is from the judgment pronounced thereon.

Among the witnesses offered was the plaintiff's wife. Objection was made to her testimony because she was plaintiff's wife. Thereupon the court ruled that the witness was competent in the suit of the plaintiff as administrator, but was not competent in his suit for loss of services, and refused to permit the witness to testify unless plaintiff would first take a nonsuit in his individual case wherein he prayed judgment for the loss of the

child's services. Plaintiff declined this offer, and then inserted in the record what the testimony of the witness would have been had she been permitted to testify.

We have concluded that it is unnecessary to decide whether the court erred in imposing the condition stated, as, in our opinion, the excluded testimony, in conjunction with the testimony of the other witnesses, failed to make a case for the jury, even when viewed in the light most favorable to the plaintiff, as it must be, inasmuch as the verdict was directed in defendant's favor.

The testimony is to the following effect: On May 19, 1921, plaintiff, his wife, his daughter Rovelda, and a four-year-old son, were driving in a Ford car from Stone to Izard County, and their journey took them to the ferry operated by defendant. On approaching the ferry it was discovered that the bank was steep and was thought to be dangerous, so Mrs. Thomas and the little girl got out of the car and walked on the ferry-boat. The car was driven onto the ferry, and following it a two-horse wagon, loaded with staves, was also driven on the boat. The boat was between fifty and fifty-five feet long, and the car and wagon and team made a load, so far as the transportation of vehicles was concerned. After the car had been driven onto the boat, Mrs. Thomas got into the car with her husband, and they, with their son, were seated in the car when the child fell, or was thrown, overboard and was drowned.

The ferry was somewhat primitive and was operated by a single ferryman, whose entire time and attention were fully occupied in propelling the ferry over the river by using a cable extending across the river for that purpose. There was an apron at each end of the boat which served as a short stage or gang-plank. There aprons were about three feet wide and extended across each end of the boat, and were raised and lowered by means of a pole known as an apron-pole. The aprons were raised before the boat started across the river, and the poles were held in place by having the ends thereof shoved under a hasp,

or catch, fastened to the gunwales of the boat. Plaintiff described the poles as being about as big around as his arm. The apron-pole was not intended to be securely fastened, as the apron was raised and lowered each trip of the boat, and the undisputed testimony shows that a weight or pressure of not more than a hundred pounds would unlatch the pole. The latch on defendant's boat was a segment of a wagon tire, and this appears to have been about the kind of latch used on other ferries on White River, and the boat itself was of the same general kind as other ferries; indeed, a witness testified that it had been made after the pattern of another boat. There were banisters on each side of the boat. The banisters were higher in the center and sloped to the ends, where they were only about twenty-six inches above the floor of the boat. The little girl was seen sitting on the pole just before she fell into the water, and plaintiff testified that he saw her just as she went over the banister at the end of the boat, the inference being that the weight of the child unlatched the pole, thereby releasing the apron, the weight of which, as it fell, threw the child over the banister into the water.

By the cross-examination of plaintiff's witnesses, defendant sought to show that the child's weight would not unlatch the pole, and that, if thus released, the pole would not have thrown the child over the banister, and that the child, in its unattended play, fell out of the boat. Inasmuch as it does not appear physically impossible for the child to have unlatched the pole and to have been hurled over the banister, we must assume that the inference to that effect, deducible from plaintiff's testimony, would have been accepted by the jury as true.

Mrs. Thomas would have testified, had she been permitted to do so, that she and the little girl walked onto the boat because of the dangerous condition of the approach; that, after they were on the boat, the ferryman did not request them to get in the car; that the child was in no unusual place when she sat down on the apron-pole;

that when the child sat down on the apron-pole she was immediately flung into the river by said apron-pole.

The boat was in midstream when the child fell or was thrown into the river, and consternation prevailed. Attached to the ferry-boat was a canoe, which was fastened to the ferry-boat by a trace-chain. The ferryman undertook to unfasten the canoe, but his efforts to do so were impeded by Mrs. Thomas, who first attempted to leap into the river after the child, but was restrained by her husband. She then frantically attempted to unfasten the canoe, and her effort to do so interfered with the ferryman's attempt to unfasten it. The canoe had no paddles or oars in it, but the driver of the wagon loaded with staves threw a stave down to the ferryman, to be used as a paddle. By the time the ferryman had released the canoe the child had floated down stream a distance estimated by the witnesses at from eight to fifteen feet, when she sank and was seen no more for three days, when her body was found several miles down stream.

Negligence is predicated upon the condition of the approach to the ferry, necessitating or making prudent the act of Mrs. Thomas and the child in getting out of the car; also upon the failure of the ferryman to rescue the child by swimming to it; and also by the failure to provide paddles or oars for the canoe, as well as upon the failure to securely and safely fasten the apron-pole.

No recovery could be sustained because of the approach to the ferry, for the reason that it was not the proximate cause of the drowning. The car was driven safely onto the boat, and it, of course, required no one's attention during the passage over the stream.

Negligence cannot be predicated upon the failure of the ferryman to leap into the river and rescue the child. It was not made to appear that the ferryman could swim, and it is mere conjecture that the child could have been rescued in this manner. The father himself did not attempt to rescue the child by swimming, and it is unreasonable for him to insist that the ferryman should

have risked the danger which the child's own father would not assume.

We think that negligence cannot be predicated on the failure to provide the canoe with oars or paddles. No witness explained why the canoe was fastened to the ferryboat. It was certainly not as safe as the ferry-boat, and there is nothing in the testimony to support the inference that due care would have required the ferryman to provide the canoe with oars or a paddle to promote the safety of the passengers by providing such means for rescuing any one who might fall, or be thrown, overboard.

As we have said, the ferryman operated the ferryboat without assistance, and, according to the testimony of the driver of the wagon, he was on the opposite side of the boat from the child and could not have seen her from the place where she fell, or was thrown, overboard. This witness also stated that it would not have been possible to have saved the child, even though the canoe had been provided with paddles.

The real question in the case is, whether negligence is shown in the manner of fastening the apron-pole. As we have said, defendant's ferry is similar to other ferries operated on White River, and the manner of fastening the apron-pole is the same on them all. A witness for plaintiff who operated another ferry testified that passengers would sit just anywhere while crossing the river; that he had seen them sit on the apron-pole, but that this was dangerous, and he had always run them off when he observed anyone doing so, but the danger consisted in being struck by the pole as it was released, and there is no testimony from which it appeared reasonable to conclude that the ferryman should have anticipated that the premature releasing of the pole might throw one off the boat. Nothing of the kind had ever occurred before. The pole was not provided as a place for passengers to sit down, nor is it shown that it was so used with such frequency or with the acquiescence of the ferryman as to make it a place where passengers were invited to sit.

The child was of tender years and was accompanied by the mother, hence the ferryman had the right to assume that the mother would exercise proper care for the child's safety. There is no proof that the ferryman saw the child sitting on the pole, and, as before stated, it was not reasonably to be anticipated that the mother would permit the child to leave her immediate presence and take a dangerous position on the boat. Nor can it be said that the pole was a contrivance especially attractive to children, but even if it could be so treated, the ferryman had the right to assume that the mother would guard the child from danger.

It appears from the cross-examination of the driver of the wagon that the child fell through the banisters, and not over them, as he said there was no noise when the child fell into the water, and that she could not have fallen over the banisters into the water without making a splash. But the jury may not have believed this witness, and, as we have said, it does not appear to have been physically impossible for the child to have been thrown over the banisters. It does appear, however, from the testimony of B. C. Cross, a witness for plaintiff, who had operated another ferry using the same method of suspending the apron, and who had also operated the ferry in question, that it would have been impossible for the pole to hang on the edge of the hook and hold the apron up. This witness is mistaken if plaintiff's version is true, but his testimony does show that extreme improbability.

Our conclusion is therefore that, viewing the testimony in the light most favorable to plaintiff, it was not sufficient to establish negligence on the part of the ferryman.

Affirmed.